We have all the underlying facts, so why don't you just move to whatever legal point you want to raise. It's okay to mention those facts as part of your argument, but we have the basis. The district court erred primarily because it allowed the injured to not be able to analyze their job well. As a physical strength demand, it did not consider the material aspects of the job, such as intellectual rigor, job use, practicing law, and hearing the stress of practicing law. The exposure to office lighting, all of these things are problematic for someone who is a migrant. It exacerbated hiring issues. This was clearly explained by the physicians. The insurance company's doctors were only asked if she could perform sedentary work, and that is a different consideration than being able to maintain an office. Now, do you agree that the doctors were provided with a list of her job duties? Some of the doctors were not called on board. The other side of the commission, I agree, but that wasn't entirely clear. It's unclear exactly which jobs she received. I think maybe two of them received, but in fact, none of them were provided. So some of them. I mean, you agree that some of the doctors who were reviewing this were, I mean, they were provided with her job duties. So I'm not saying I disagree with you that, by and large, they reported their findings in terms of a sedentary position. I'm just trying to assess the significance of the fact that, say, when a doctor like, I forget the last one, is it Chaffetz? Yeah. Chaffetz. Yeah. If you look at that report, that very lengthy report, we can see a list of her job duties in the report. I'm just trying to figure out what the significance of that is to this question. If he's provided a job, that's one thing. But if he's not asked the question whether she can practice law or perform a good job, is that what they're giving to her? I don't think it's entirely relevant, I guess. Right. No, I understand. Your answer may be it may not matter. Right. And that's a hard question to kind of answer. So can someone with a migraine disorder perform an inherently very stressful occupation? You know, they can't imagine a more stressful occupation than practicing law. And, you know, can you do that? Can you do that day in and day out? Can you do that reliably for your clients? Can you come to, can you have all the topics and information to be able to understand that and be able to say how quickly can you provide the work that's needed? Well, Chaffetz, go ahead. No, no, you go ahead. Isn't the point of the own occupation part of the policy and the argument that you all spend a lot of time making is that she has very specific demands. She's not just an attorney or employed in a sedentary occupation. She's an attorney doing a particular type of work. So when we say own occupation, it begs the question of whether she's doing litigation work, whether she's got an office practice, whether she is a tax lawyer, or whether she is drafting leases and agreements, contracts, and things of that nature. Isn't that the point of the own occupation argument? That's correct, yes. You're trying to put a finer point on what the insurance should cover. Right. They had to look at the job, the current own occupation. It's not can she perform sedentary jobs, whether she can perform an occupation. That's a question that they never asked any of these insurance peer reviewers. And it's a question that they never analyzed any of these guidelines. All they say is that we find that she can do sedentary occupation. And that's not enough. This Court clearly stated that in the Birch case and in Robinson. We didn't have to consider the finer details. Is Birch your best case for that? I just ask because it is unpublished, if I'm not mistaken, right? I don't think Birch is unpublished. Okay. I could have misspoken there. Robinson is unpublished, I'm sure. Yeah, you're right about that. Let me go back just real quick. Dr. Chaffetz, I was looking at his report. I mean, he is offering findings in terms of an attorney, in terms of an attorney being able to do work, because he says that Foster would not be limited to complex legal tasks if these did not involve much oversight and responsibility. Isn't that what Chaffetz says? Chaffetz says that elsewhere in his report, he notes that their job requires oversight. Right, right, right. Essentially, he really didn't get into his report to provide that support. Approval from Chaffetz. Yeah, yeah. Okay. What about the doctors who are reporting about whether it – I mean, I think – I don't mean to put words in your mouth. You were saying at first that the doctors were considering the physical aspects of her job, you know, sort of the job as a physical job, can she do X, Y, and Z. But there were some reports, if I'm not mistaken, and correct me if I'm wrong, that did consider the cognitive aspects of her disability. You're talking about the cognitive or non-exertional aspects. Is that right? I'm sorry. That the doctors were considering not just physical, but the cognitive – her ability to do cognitive tasks. The only thing that measured her ability to do complex tasks was the IME, which is a neurological exam. Basically, an exam that measured her IQ. She's not suffering from a severe migraine. She is highly intelligent. So she scored pretty well on her IQ test. But that doesn't really answer the question. At some point, someone suffers from a migraine disorder and they start to flop. Right. If anyone here has suffered from migraine, I know someone has suffered from migraine disorder. You can't. You're basically incapacitated during the migraine. A lot of people, the day after, have a severe brain fog, which is evidence. The day after her neurological exam, the medical records come on the very next day, and it's true that she had brain fog. She developed it. She went through a very short time in bed for a long, long time. But none of those – that is the closest thing that came to measuring her cognitive ability. That's just – you're all awake during this time. She's not suffering from a migraine. Would your view be that even if you had a doctor or doctors who were evaluating her cognitive abilities, that's not sufficient for the own-occupation clause? In other words, the assessment has to be in terms of specific job duties of an attorney. Would that be an argument? Is that an argument that you're making? That is an argument. Of course, in the Henry case, the one case that we cited, the court – there's an IED in that case, too, and like the Paulson case that I mentioned before, they've always fascinated the question of if she can't perform some of her work. But the court in that case found that that's going to be irrelevant to a migraine situation. These are – every moment that someone suffers, you have to look at the type of reaction the body has to it. This isn't someone with a bad back. This is chronically in pain. This is someone who, when she's in a migraine, she's not going to get work. And when she's recovering from a certain migraine. So the fact that she performed okay in some tasks during that exam is not unheard of in the court. Consistently and on time and being able to meet deadlines and not have a lot of systems working. What would you expect a principal to do over and above what Dr. Chaifetz has done in order to properly evaluate and deny the claim? If you're saying this isn't sufficient. Ask their doctors, can she perform a job that is enormously stressful that requires that she be there a long time and be comfortable and be able to meet deadlines and perform a job that – or repeat it out as if they're going to repeat off of that. And to consider the intellectual rigorous challenges of practice at home. And migraines aren't like people with bad backs. We can't look at an off MRI and demonstrate that there's a herniated disc and they're going to get pain from that. And it's basically subjectively what is affecting someone. Tell your doctors I'm having migraines sometimes four to six times a week at some point. And it's not by definition that I'm going to have subjective benefits. Some of these policies have a clause where if the disability is based on subjective symptoms, they can benefit from pain. This policy is not that. She proved that the disability tests were good. She gave headache journals. She gave her – all of her treating doctors said that there were complaints of migraine disorder. Even the first two doctors hired by Bristol said that everything she said was consistent with migraine disorder. The only doctors that said she didn't perform full-time surgery were all they said. The reason behind it is that her EPG and her MRI are normal. Well, that's very common with migraine disorders. Doctors know that. Many specialists explain that to their treating doctors. Of course, her EPG and her MRI are normal. It's a migraine disorder. So the basis of their reasoning on why they rushed and why they didn't care is not sound. The biggest thing that the district court missed was should somebody just be able to analyze their job in relation to their academic outcomes? It's a really tragic circumstance. She was the primary breadwinner of her family. She had two young children of her own. She was working in her dream job. And she has gone through every possible conceivable method of treatment for this disorder. Just to name a few, 20 different medications, hypnotherapy, counseling, Botox injections, acupuncture, sinus surgery, steroid injections, massage therapy, biofeedback, something I can't even pronounce, dilation of the sinus tablet, and most recently a nervous stimulator that she had inserted into her breast that leads up to her spine to try to release the stents. No one does this for fun. This is a real situation, a real headache disorder. The medical made it seem like this was all in her head. This is all psychosomatic. It's not the case. In the record, the reason why they focused on this being psychosomatic was there was some discussion with one of the treating providers who she had seen for hypnotherapy. Everything else had failed. She talked about being able to defer headaches with the power of her mind. This is hypnotherapy. This isn't exact form of medicine. Even her own doctor questioned the relevance of hypnotherapy and the usefulness of this. She was doing everything she could, but the insurance company and the insurance company's doctors took that information around and built this case that this is all psychosomatic. But it's not. What do you do with the evidence, the video surveillance evidence that showed maybe she wasn't suffering from any difficulties? The surveillance was actually supportive of a plan I was involved in. All it showed was her going to a car where the doctor was. There was nothing that was negative about it. Basically, I saw it in that situation. And the blogs, the blogging, evidence of blogging? The blogging, she was very forthright about it. Really tried to stay active. She logged about once a month on blogging. And she also wrote a short, unpublished article. She was very forthright with this idea with the principal and with her doctor. She wasn't hiding anything. But that's a different situation. Being able to write on your own time and not experiencing migraines is a different situation than being able to answer phone calls to meet any deadlines, to meet the demands of the privacy law. And that's something that the insurance company focuses a lot on, quality of life. Was she doing litigation work? I mean, is she enrolled as counsel of record in state and federal courts here? A little bit of litigation. I mean, it's primarily health care practices. A lot of research, a lot of writing. And some litigation. But her duties were provided directly from her employer. There wasn't a whole lot of question of that information. Initially, the firm didn't have great job descriptions. That's basically what we provided. And they built in a reasonable amount of complex information and complex legal theories. They needed to act diligently and reliably in compliance with the court's obligations. They needed to comply with deadlines and time constraints until all time was adjusted to a high level of rest and executive function. These are all things that were provided in an issue to the crowd. And that was all essentially ignored by the principal and the reviewed auditors. Every single question that was asked in each of the seven reviewed auditors is, can she perform sedentary work? In general, sedentary work is a different consideration. So I think we all know the facts and the lies. It's extremely stressful, stressful. As is being in an office for a long period of time. All these things about her job were brought to light. You cannot, in this circuit of state, you cannot put them in a generic physical domain that would penalize her. Yes, and you've saved time for about an hour. Christian? Thank you. Good morning, Your Honor. Good morning, Your Honor. I stand up here standing before you in front of the principal. Thank you. We have not heard from Mr. Dallarano as to why my client's decision is alleged to not support the rest of such evidence. And I am here now to tell you why. It is very much supporting the rest of such evidence, which is exactly what the court has to look at. This case, even though the court conducted no more review of the decision-making, the court applies the same standard that the district court applied, which is the arbitrary and capricious standard review. My client has expressly been granted discretionary authority in the group policy that underlies Ms. Foster's claim, and as a result of that, the court does not substitute its decision for my client's decision, but provides deference to principal life insurance, looking only as to whether it abused its discretion in determining whether, in this specific case, Ms. Foster can or cannot do the substantial material duties of her own occupation. My client was very much aware that Ms. Foster was a lawyer. She was also very much aware that she was a health care lawyer with a predominantly regulatory practice. Ms. Foster provided her job duties very early on. Principal life contacted her employer and asked for a job description. No official job description was provided because none was available. But later on in 2015, Mr. Stolyar wrote a letter which set out the level of executive function that, in his opinion, was necessary for Ms. Foster to do her own occupation. Do you agree that being able to perform sedentary work, desk work, isn't sufficient for the own occupation qualification of the policy? I absolutely agree. And we're all lawyers. We know that we do a lot more than just sit at a desk. And we very much know that the non-exertional component of the occupation, meaning the ability to concentrate, the ability to process information, the ability to phrase that information anew, provided in a persuasive manner, the ability to draft briefs, counsel, provide opinions, is obviously very much a component of what we all do. So what I heard you say to Judge Engelhardt is you agree that we need to find... I mean, what you say about the burdens is consistent with my understanding. Even if the other side proves a substantial case, you can also have a substantial case and you win, essentially. But as I understand it, we need to look in the record and find that prudential... I'm sorry, that's wrong principle. I keep making that mistake. That principle had evidence that she can perform the duties of her occupation, not just sedentary work, but in other words that we've got to find doctors assessing her from the point of view of the specific duties of her occupation. We need to find that in the record. Is that right, or do you...? No, not entirely. Doctors are doctors. They render medical opinions. They don't necessarily render vocational opinions. So they will identify restrictions and limitations that they can identify in the medical records which would impair Ms. Foster one way or the other. Lots of these physicians did not look just at her ability as to whether she was sick. They did look at her mental status examinations. They looked at her cognitive abilities. They assessed her ability to read, write, and think and to especially assess the non-exertional duties because during the appellate review, that specific argument was of course brought to my client with the connotation that the non-exertional duties of a lawyer need to be evaluated. My client had her submit to an independent neuropsychological evaluation. So that's Dr. Chaffetz. That is Dr. Chaffetz, right. And it is our submission that a neuropsychological evaluation is exactly that. It's an objective assessment of a person's cognitive and behavioral functions. It measures not just intelligence, as Mr. Toledano seemed to think. It measures problem-solving and conceptualization. It measures planning and organization, attention, memory and learning, concentration, language, academic skills, perceptual and motor abilities, emotions, behavior, and personality. It provides input into an individual's ability to function from a cognitive perspective. That's very helpful. But what do we do with Dr. Chaffetz's finding that, and I'm paraphrasing, yes, she can perform the work of an attorney if it does not involve oversight. What do we do with that? I disagree with the way that that is his opinion. I think his opinion is that she can very much function from a legal, reasonable perspective, which is what your job entails. She was an associate attorney. She was not a partner. She was an associate attorney from a regulatory perspective. She spent eight hours of her day, every day, by her own statements in her office. She drafted, she counseled. And there's nothing in Dr. Chaffetz's report which would not support her inclusion language. She can still do that. She demonstrated increased concentration and higher level of executive functioning, which is exactly what Mr. Stollier pointed out in 2015. She needed it for her job. And Mr. Stollier, in his letter from April 21, 2015, did not say that she needed to be overrated. You ought to practice increased oversight. Is that her law partner, Stollier? That's her boss, right? But what was his ultimate opinion about whether she could continue working? Him not being a doctor, of course, and providing an opinion two years after the fact, he says that he observed her attempting to meet the foregoing requirements while enduring daily headaches, which was in 2013, according to the record, and that she was not able to do it at that point. That's his opinion. Whether that answers our question? No, I'm not saying it does. I'm just saying from her boss, the lawyer says she can't do the work. Her boss thought that she wasn't performing, whether that was whether she did not meet her hourly requirements, whether that was because she ended up making mistakes, whether that was whether she actually was disabled from her occupation, we will never know. But he certainly provided a statement in her support, yes. Before we move on from the definition, was there anything else that principle relied on to define own occupation, aside from Mr. Stollier's letter and any comments that the plaintiff herself may have made? Her own statements. But nothing else besides those two things? Okay. So that's the parameter. Okay. On several occasions, descriptions of what she did and Mr. Stollier's letter. And that brings me to the point that Mr. Taladano repeatedly argues in this case that this letter, Mr. Stollier's letter, was not provided to all physicians who reviewed the records. That's simply not true. The letter was provided in 2015. Obviously, it couldn't be provided to anybody who rendered an opinion in 2014. So the idea that only the physicians who were later on in the record had that letter, well, of course, because at that point principle had it and could actually provide it. There are several medical opinions here who were rendered during 2014. Those opinions could not consider that letter because principle life had not had that letter at that point to submit. But what the record shows, and one of the reasons it is so voluminous, and my client certainly apologizes for that because that makes it quite difficult sometimes, it contains itself in reverse chronological order every time my client sends it out. So unlike other insurance companies that I work with, there is not just a letter or a reference in the record saying, Hello, we sent the records. There is actually a full and complete set of the records that were sent out. So the court can actually see that once the referral is being made to an independent vendor, the following set of several thousand pages are the pages before that, going backwards, sent as a complete submission to the vendor. And based on that inclusion of the actual records, it is clearly visible that the information that was provided by Ms. Foster was given to these physicians. My client is not in the business to render opinions that are not based on the full set of evidence. Once it receives something from the claimant, it wants to give her a fair shot, which was one of the reasons it approved benefits in the first place. It took her conditions for what it's worth, for what she presented it to be, and then continued evaluating, meaning it would not be in the business of withholding documents and not providing the full set of documents to the reviewing physicians. Hence, I take objection to the argument that my client did not provide the full occupational information to the physicians. It did every single time, and it asked the physicians to provide opinions on the cognitive demands of a health care lawyer. Aside from Dr. Shaffitz, who we've been discussing, can you point to other physicians, reviewing physicians, who evaluated her in terms of non-exertional cognitive abilities? Yes. Dr. Harrop rendered a psychiatric opinion, which reviewed Ms. Foster's mental status examinations, which were done by her own physicians, and demonstrated, based on those, that her memory, cognition, and concentration were not impaired as a result of her condition. Which leads me to briefly make the point that Mr. Toledano has suggested several times that my client did not believe that she had headaches and demanded objective evidence. My client did no such thing. We do not debate that she has headaches. We do believe that the record does not necessarily support that it's a migraine disorder, as she seems to think. But leaving the etiology question aside, we take her word for it that she has headaches. The question is not whether she does or does not. The question is whether those have arisen to a level that would actually impair her, objectively demonstrable, from performing the duties that she performed as a healthcare attorney prior to leaving her job. We believe that the record contains substantial evidence that questions that, and that supports my client's determination that she could do it. And that, of course, also brings up the whole question as to whether her headaches are of a functional nature, or whether they're actually of a physical nature. And to the extent that Mr. Toledano suggests that my client pulled it out of its head that these headache syndromes are of a psychological or mental nature, much rather than a physical disorder, the record itself forced that conclusion onto my client. The record is replete with connotations of a functional overlay of her condition. The record is replete with notations that her headaches are not like headaches that you and I might have, which occur in very inopportune moments, but her headaches actually can be deferred. They can wait until an event happened, and then they come back. She is able to put them in a room and throw away the key. Those are her words. She developed her headaches when her mom stopped as a caretaker for her children. She was shamed by her mother by her own admission to not stay at home. And while the appellate brief contains reference to her dream job, I would say the record makes it very clear that being an attorney was not her dream job, but that she much rather wanted to do something else, and that it was her day job, and that she was actually shamed by her mother for not staying at home, that her mother stopped being a caretaker, that she then developed a headache disorder, which eventually led her to be the caretaker of her two children. And having two children of my own, taking care of two children is not lying on a bed, but it actually involves a lot more than that. The record also demonstrates that she has a longstanding history of other emotional problems connected to a number of different situations in her life, and that as a result of that, her headaches are classified as breaks, that her headaches allow her to put on the breaks whenever she's overwhelmed, that her headaches allow her to stop doing something that she doesn't really want to do. And I think this case is very much the climax of that specific scenario. There was evidence of opioid dependence. Is that right? There is one medical opinion that as a result of the opioid regimen that Ms. Foster is under, including Norco, that there might be a situation of hyperalgesia to the degree that the pain gets exaggerated by an opioid dependence, similar to a functional overlay, really. And that while the actual situation might not be present anymore, the pain persists either due to emotional symptoms or due to opioid. Yes, there is one opinion in the record that believes that there is also another component to those headaches. Yes. So it is not a clear-cut picture. And migraine headaches is one of the diagnoses. Of course, I'm sure you recognize as judges we don't have any expertise to resolve a disagreement about the etiology or whatever of her headache. We don't do that. And I'm not expecting you to. All I'm saying is there's substantial evidence here which suggests all kinds of different possibilities. And as a result of that, we also believe that there's substantial evidence which supports my client's decision, supports the decision that these headaches are not of a physical origin, that they're of a psychogenic origin, and that the functional overlay leads to such a finding that with proper treatment they might go away, but that in any event she's not impaired to such a degree that she cannot do what she did before. And Dr. Shafetz's opinion exactly did that. Dr. Shafetz did not evaluate her from a sedentary perspective. He did not see whether she was able to sit nine and a half hours in his office, which she was. But what he actually did was he had a battery of tests that he asked her to perform. And my understanding is it's quite a grueling process. And the answers get evaluated. They get scored. It's quite a science behind it. And at the end of the day, they get evaluated with regard to several different aspects, like I said before, intelligence just being one of them. But the ability to function with the condition that the individual is under is exactly what an INE does. And that is what I understand in the disability context to be the foremost evidence of any type of cognitive and concentration issues. And is it your argument, excuse me, that Dr. Shafetz was performing this battery of cognitive non-exertional tests with her specific job duties in mind? Yes. Sort of the whole background assumption? Yes. Okay. That is my argument. And he was obviously very much aware of what was supposed to be understood by my client and what my client wanted to understand. And as a result of that, that is what he did. He performed testing with the understanding that she was a lawyer and a health care lawyer. He had a specific description of the job duties. And he provided answers to the question as to whether she was able to engage in legal reasoning. I believe I talked about the objectiveness. Again, it's not about the headache disorders. It is about the functioning and the lack of functioning that needs to be objectively demonstrated. The INE, in our opinion, objectively demonstrates exactly the opposite than what Ms. Foster would have liked. It demonstrates that she could do her occupation. Another point that was raised by Mr. Tolano is the conflict of interest. There is no evidence in this case that my client, while it certainly has a structural conflict of interest, did anything that would show that the decision was tainted as a result of that. I believe the fact that the claim was initially approved, giving Ms. Foster the benefit of the doubt while they continued to evaluate, the question that it included a myriad of different physicians trying to understand what Ms. Foster's situation was, anybody from neurologists to psychiatrists to psychologists. And at the end of it went beyond the mandates of what the Department of Labor Regulations require by conducting an INE, which is not something my client had to do, but it chose to do because it really wanted to give Ms. Foster the benefit of the doubt, and by providing her an additional level of appeal, which is also something that my client didn't have to do. Most insurance companies provide one mandatory appeal as required under the Department of Labor Regulations principle, allowing her to present additional evidence which is fully and fairly considered. As a result of that, the disagreement by Ms. Foster in and of itself does not show that there is a conflict of interest here, which tainted my client's decision making. My client provided a full and fair review and, in my opinion, worked exceedingly hard to reach a fair decision in this case. All right. Thank you, Ms. Christian. I believe that's all.  Mr. O'Donnell, you might have time for a vote. In your view, there is not substantial evidence. Is that right? I'm sorry, Mr. Chairman. In your view, there is not substantial evidence? There is not substantial evidence because, again, there was no consideration for actual job duties, and the reasons why she couldn't perform those actual job duties, which her doctors explained, as well as two of the doctors that the principal hired explained. There were specific duties of her job she could not perform with her migraine disorder. There is a conflict of interest here. Ms. Christian said there wasn't. There clearly is. Before you get to the conflict of interest, let me ask the flip side of the question. I asked your opponent, where should principal look to obtain the definition of own occupation? In other words, principal job duties. Assuming that they have the letter from Mr. Stolier, the employer, and they, of course, speak to her and interview her maybe probably more than once since she met with these health care professionals, where else should principal look to discern the principal job responsibilities? They can do a number of things. One is to get the information from the claimant. Another is to get it from the employer. Another is to look at the DOT. A lot of long-term disability insurers will look at the Dictionary of Occupational Titles, see how the job is described there, perform an in-house vocational review. That's something that never happened here. And Ms. Kirsten says that it's not the job of the physicians that they hire to do peer reviews to make vocational determinations. Well, someone's got to do it. If the physicians don't do it, principal has to take on that responsibility. And they never did it either. They just said, can she perform sedentary work, and they relied on these peer reviews that said that she could. Some of them said they could. Some said she couldn't. And that's just not enough. There's got to be, you know, the essence of these claims are, can someone perform their occupation? And without looking at the occupation, just lumping into the sedentary category is not enough. I mean, I think everyone agrees with that. I think we're all on the same page, including your opposing counsel. So it sounds like the opposing counsel is relying pretty heavily on Dr. Chaffetz's report, the IME. And I'm looking at Dr. Chaffetz's report, and it's very clearly done with the knowledge that she is, I'm reading from it, she is a 38-year-old lawyer with a long history of headaches and possible seizures. So, I mean, that report at least is being done from the perspective that she is an attorney with some knowledge of her job duties. So, I mean, it's not, I don't think it's accurate to say that that report is done purely from the perspective of a sedentary work. Or do you disagree? I disagree. Look at the conclusion. Look at the question that was asked. Okay. All 70 stalkers, look at the last question that was asked. Can she perform full-time sedentary work? That's what's asked, not whether they can perform their duties, healthcare. Okay. And, you know, one thing, they come up with this idea that this was psychosomatic and psychogenic in origin, or that it was opioid abuse. There's a policy limitation in the policy that prevents benefits past two years. These opinions were goal-oriented. They were trying to cut her off at this two-year mark if she were to see benefit at all. And that opinion, the whole idea that this was opioid-dependent in origin, was completely refuted by her treating doctor, who noticed that she's on a very small amount of opioids, and really that's the only thing that curbed her pain. And she's had this headache disorder since childhood. It's just, I mean, in her adulthood it got worse and it got to the point where it was really guilt-taking. But she's had it with and without opioids, and this is not the cause of it. And also it's not psychosomatic. No one goes to the lengths that she's gone through. The tens of thousands of dollars she has in medical treatment, and to have something surgically implanted inside of her, she doesn't have a severe condition. I just saw you last minute talking about the conflict of interest, which we're about to get to. I interrupted you at the beginning of your thought. There's absolutely a conflict of interest here. The Supreme Court in that life-persistence plan knows that it's an inherent conflict of interest. They have to approve the benefits and then pay out the benefits. Every dollar they approve, they pay out. And most companies don't want to do that. Well, again, I think we probably all agree with that, that there's a structural conflict of interest. But would you also agree it's one factor in the analysis? It's one factor in the analysis. So why should it move the needle in this case? Maybe it's hybrid. In every case, you're going to have treating doctors supporting a disability. In most every case, and then you're going to have the reviewing doctors who do not support a disability. And it's hard. You have to look at all the facts and circumstances. You have to look at all the medical evidence to determine who's right here. Was there an abuse of discretion? The Supreme Court noticed that this is the topic of interest. It is something that the court has to weigh. And in a close call, it can tip the scales of abuse of discretion. It should here. Thank you, Mr. Kaldani. Your case is under submission. That's the case for today.